PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ LAFONTAINE, Defendant and Appellant.

No. 4322.   Argued March 25, 1931.—Decided January 19, 1932.

*A. Reyes Delgado* for appellant.   *R. A. Gómez, Fiscal,* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the Court.

The District Attorney of Arecibo filed an information against José Lafontaine charging him with murder consisting in the killing with malice aforethought of Rogelio González, a human being, with a pistol.

The case went to trial and the court, in accordance with the verdict of the jury who found him guilty of involuntary manslaughter, sentenced him to two years in the penitentiary at hard labor.

Feeling aggrieved by the judgment, the defendant appealed and has assigned in his brief four errors which he argued at length.

The first error is that the court, over the objection of the defendant, permitted the reading by the district attorney of a document alleged to be an affidavit of Andrés de Jesús, a witness for the prosecution, and that it then denied a motion to strike out the said affidavit.

For a better consideration of the question raised, it seems advisable to transcribe all of that part of the record having reference to the incidents on which the assigning of error is based. In answer to questions propounded by the district attorney, the witness Andrés de Jesús testified as follows:

"Q.—What took place in the house of José Lafontaine on the 15th of January of this year, if anything occurred and if you know it? A.—Well, what happened was that at nine o'clock in the evening I went out with Ramón de Jesús and Luis Maldonado; that they went home and I remained looking after some oranges that I had by the roadside. Q.—Where? A.—Facing the house of Juan Soto, and then about ten or eleven at night I heard an explosion, a shot, but did not pay attention, and then shortly afterwards Lafontaine came down to the house of Juan Soto and called him, and Juan Soto came out with Lafontaine who gave me a paper to be taken to the house of Ramón Márquez, and when returning from the house of Ramón Márquez I went to Lafontaine's house, where I found Rogelio González wounded in Lafontaine's room. District Attorney.—This witness had previously made statements that are inconsistent with those

he has made now and the prosecution intends to impeach his testimony. Attorney Reyes Delgado.—The defense now maintains that it should be made known whether such statements were made in writing or verbally, and, if in writing, that they be shown to the witness, and that before they are handed to the witness this attorney should be given an opportunity to examine the writing by which the district attorney proposes to impeach his own witness. District Attorney.—The law does not require the production of a writing, but if the statements are in writing so much the better. I have such statements and I am going to read them out to the witness. Attorney Reyes Delgado.—Before any document is read to the witness, or presented for consideration, counsel for the defendant must be given an opportunity to see such document or writing. District Attorney. —It is not a matter of introducing a document in evidence but of reminding the witness of statements that he has previously made, that are in writing, and that the district attorney now holds. Judge. —Let the prosecuting attorney proceed. Attorney Reyes Delgado. —I take exception. Q.—Do you recall having testified before the Municipal Judge of Utuado and before me, in the municipal court, on or about the 5th of February of the present year? Do you recall having seen me there? Do you recall whether you saw me there? A.—I do. Q.—Was the municipal judge there also? A.—He was. Q.—Do you remember having testified on that 15th day of January that while you were in the house of José Lafontaine, located in the ward of Río Abajo, Utuado, at ten o'clock at night there arrived Rogelio González, a peón of Lafontaine hired by the month, with a cow that had gone astray, and that on arriving the said Rogelio told Doña Carmita González, Lafontaine's mother, that the calf had sucked the cow; that the said Lafontaine was in bed and said: 'So the cow was sucked?' and seizing a pistol which lay on a chair and looking at Rogelio, who stood outside the house and near a stable, said to him: 'You deserve to be shot,' at the same time firing the pistol at him. Attorney Reyes Delgado.—We move the court to strike out the whole statement read by the prosecuting attorney, and to instruct the members of the jury that under no circumstances are they to take it into account or to consider it in any way. The reason for our motion is that the district attorney is trying to introduce a statement, which he could not otherwise introduce, for consideration by the jury on the pretext that he is going to impeach his own witness. Judge.—Motion overruled. Attorney Reyes Delgado.—I take exception. Q.—Did you hear what I said to you? A.—I did. Q.—Is it necessary for me to repeat it to you? Do you remember

having made that statement? Do you or do you not? A.—I do not remember. Q.—Do you not remember having further stated that after that shot was fired by Lafontaine, Rogelio fell to the ground exclaiming, 'Ay, Ay,' and that Lafontaine thereupon took a sheet from the bed ran towards Rogelio, lifted him and carried him to the bed? Attorney Reyes Delgado—I reproduce the previous objection, in order not to appear as consenting to the continuation of the examination. I object on the same grounds as formerly. Judge.—Objection overruled. Q.—Do you or do you not remember having made such statement? A.—I do not. Q.—Is it not true? A.—It is not.''

Section 245 of the Code of Criminal Procedure provides:

''Sec. 245.—A witness may also be impeached by evidence that he has made at other times statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of time, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them.''

Section 159 of the Law of Evidence reads as follows:

''Sec. 159.—A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements, must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them.''

Both these provisions are substantially the same and in both the Legislature expressly provided that, if the statements be in writing, they must be shown to the witness before any question is put to him concerning them.

Underhill in his work on Criminal Evidence (3rd ed.) treats this question with much clearness. He says there (secs. 380, 381, and 382):

*"Impeachment of the adverse witness by showing contradictory statements—Necessity for foundation.*—The witness whom it is desired to impeach may, upon his cross-examination, be asked if he has not

made statements out of court relevant to the guilt of the accused which are inconsistent with or contradictory of his testimony given on direct examination. All the circumstances attendant upon the extrajudicial declarations must be embodied in the question. If he does not admit that, upon the particular occasion designated, he made the statement, it may be proved that he did in fact make it. The same course may be followed with a witness upon his direct examination in case he proves hostile to the party calling him. But in either case it is always absolutely essential in fairness to the witness to lay a foundation for contradicting him by bringing to his attention in the question put to him, clearly and distinctly, all the circumstances of the time, place and person under which the contradictory statements were made. By having his attention called directly to the exact circumstances under which it is alleged the contradictory or inconsistent statement was uttered, the witness is protected from an unfair surprise. He has the right to explain the contradiction. When his memory is aroused and refreshed by these details he may be able to show that he was honestly mistaken on the former occasion, or that the persons then present misunderstood or misquoted him. The impeached witness ought to be permitted, in giving his evidence, to state any facts which will explain or reconcile the seemingly inconsistent utterances or show their relation to one another and the meaning and purpose of each. If the witness declares he does not remember making the contradictory statements, he may be contradicted at once, with further foundation for their introduction. . . .

"*Impeachment by contradictory affidavits, depositions and other writings.*—The rules governing impeachment, by contradictory statements, as above set forth, are equally applicable whether the inconsistent declarations are oral or are contained in affidavits, former pleadings, depositions, written statements, letters, or memoranda, or in publications by the witness on the subject to which his testimony relates. Thus the accused, when testifying, or any witness called in his behalf, may be contradicted by the evidence as stated by him in the affidavits which were made and used by the accused upon a motion for a continuance or postponement. Contradictory statements contained in affidavits, depositions, and other formal judicial documents are obviously to be considered from a different point of view, so far as their impeaching character is concerned, than oral statements. . . . .

"*Contradictory writings must be shown to the witness who is to be impeached.*—The writing by which it is proposed to contradict

the witness must be shown him on his examination so that he may read it, or it may be read to him. He must be asked if he wrote it or signed, and if he admits this his attention must then be called to the inconsistencies. . . . If he admits that he wrote or signed it, the whole ought to be read to the jury as the best evidence of what the writing contains. If he denies that he is the author, the fact that he wrote it may be proved by proper evidence. The stenographer who took down the testimony of a witness at a former trial to impeach the witness may read from his notes if he will swear that they are accurate, the witness having first been asked if he has testified on the former trial. . . ."

We think that said statutory provisions, applicable to criminal as well as to civil cases, are so clear that a mere reference thereto is sufficient to conclude that the error assigned has been committed. But we have quoted the opinion of the above mentioned text writer because it throws light upon a question that has been much discussed in this Court from different angles. See the cases of *People v. Méndez,* 39 P.R.R. 590; *People v. Rosa,* 37 P.R.R. 400; *De Gracia v. Guardiola,* 37 P.R.R. 774; *People v. Plata,* 36 P.R.R. 530; *People v. Rodríguez,* 36 P.R.R. 388; *People v. González,* 36 P.R.R. 781; *People v. Ríos,* 34 P.R.R. 519; *People v. Gómez,* 33 P.R.R. 179; *Vélez v. Porto Rican & American Insurance Co.,* 32 P.R.R. 112; *Sosa v. Cardona et al.,* 30 P.R.R. 255; *Méndez v. Martínez,* 24 P.R.R. 224; *People v. Ramírez de Arellano,* 25 P.R.R. 243; *People v. Santiago,* 16 P.R.R. 446; *People v. Rojas,* 16 P.R.R. 238; *People v. Kent,* 10 P.R.R. 325; *People v. López,* 8 P.R.R. 546; *People v. Ruiz,* 7 P.R.R. 129; and *People v. Díaz, alias Martillo,* 5 P.R.R. 197 (2d. ed.)

The error committed appears still more clearly from the conduct of the district attorney throughout the whole incident. The means provided for a party to impeach a witness by showing that he has made at other times statements inconsistent with his present testimony, should not be availed of for introducing such inconsistent statements in evidence.

In his brief the *Fiscal* maintains that no error whatever was committed because "what really mattered was that the

witness be acquainted with his former statements, whether made orally or in writing; and that if they had been made in writing they should be shown to him so that he might read them or they might be read to him, in accordance with the jurisprudence just transcribed by us. The prosecuting attorney followed the latter procedure in the case at bar."

If, as has happened in other cases, no objection had been made by the adverse party, the question could not have been raised on appeal; but here the adverse party repeatedly requested the court to uphold his right to read the writing himself, and the court refused to grant him such request. The writing might have contained other statements supporting the present testimony of the witness.

Moreover, counsel for the defendant finally moved the court to strike out the statement read by the district attorney and to instruct the jury not to take it into account at any time, on the ground that the purpose sought by the district attorney was to introduce a statement which he could not otherwise introduce, and all that the court did was to say: "Objection overruled."

As the error committed is of an essential character, it is unnecessary to consider the other assignments made. The judgment appealed from must be reversed and the case remanded for a new trial.